Darwish Auto Group, LLC v TD Bank, N.A. (2024 NY Slip Op 51779(U))

[*1]

Darwish Auto Group, LLC v TD Bank, N.A.

2024 NY Slip Op 51779(U)

Decided on December 30, 2024

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 30, 2024
Supreme Court, Albany County

Darwish Auto Group, LLC & DARWISH GENERAL CORP., Plaintiffs,

against
TD Bank, N.A. & WALID DARWISH, Defendants.
WALID DARWISH, individually and direct and derivative action on behalf of Darwish Auto Group, LLC, DP RE Holdings, LLC and Darwish General Corp., Third-Party Plaintiff,
against
BARRY FRIEDER, MARK MANZO, DAVID YUSKO, MELISSA LACARTER, JOHN DOES 1-10, and JANE DOES 1-10, Third-Party Defendants.

Index No. 905851-22

ArentFox Schiff, LLP
Attorneys for Plaintiffs and Third-Party Defendants
(Michael S. Cryan, Daisy M. Sexton, Michael P. McMahan and Shayshari S. Potter, of counsel)
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Archer & Greiner, P.C.
Attorneys for Walid Darwish
(Michael S. Horn, of counsel)
1211 Avenue of the Americas, Suite 2750
New York, New York 10036

Richard M. Platkin, J.

Expedited discovery in this commercial action is complete (see NYSCEF Doc No. 1067), and plaintiffs Darwish Auto Group, LLC ("Darwish Auto") and Darwish General Corp. ("Darwish General") (collectively, "Companies") move for partial summary judgment on their amended complaint (see NYSCEF Doc No. 742; see also NYSCEF Doc No. 761 ["MOL"] at 2).
Defendant/third-party plaintiff Walid Darwish opposes the motion and cross-moves for partial summary judgment on certain of his counterclaims/third-party claims (see NYSCEF Doc No. 805).
I. BACKGROUND
A. The Parties and Their Transactions
The Companies own and operate ten automotive dealerships in upstate New York ("Dealerships").[FN1]
Walid Darwish ("Darwish") is the sole member of Darwish Auto and the sole shareholder of Darwish General.
To finance his acquisition of the Dealerships and their associated real estate, Darwish borrowed about $62 million ("Loan") from an affiliate of 2427 Investments, Inc. ("Lender") and DP RE Holdings, LLC ("Secondary Lender") (collectively, "Lenders"). The Lenders are themselves affiliates of Potamkin Automotive Group ("PAG"). Of the Loan proceeds, $46,474,000 was used to purchase the real estate, with the remainder used to capitalize the Dealerships (see NYSCEF Doc No. 743 ["Frieder Aff."], ¶ 4).
The Loan was subject to an Agreement Regarding Borrowing dated April 18, 2022 (see NYSCEF Doc No. 744 ["Borrowing Agreement"]), which required Darwish Auto to be "governed by an Operating Agreement dated April 18, 2022 entered into by Darwish, its sole member," and Darwish General to be "governed by a Shareholders Agreement dated April 18, 2022 entered into by Darwish, its sole [shareholder]" (Borrowing Agreement, §§ 1-2).
The Operating Agreement for Darwish Auto dated April 18, 2022 states that management is vested in a committee of three managers, of which no manager may act alone (see NYSCEF Doc No. 745 ["Operating Agreement"], § 3.01; see also NYSCEF Doc No. 746 [certificate of amendment]). The Shareholder Agreement for Darwish General, also dated April 18, 2022, provides that the corporation is managed by a three-member board of directors, of which no director may act alone (see NYSCEF Doc No. 747 ["Shareholder Agreement"], § 3.01).[FN2]

On April 18, 2022, Darwish gave written consent to the formation of a management committee for Darwish Auto and a board of directors for Darwish General (collectively, "Governing Bodies") consisting of himself, Barry Frieder and Mark Manzo (see NYSCEF Doc No. 749). The latter two individuals are associated with PAG.
The Borrowing Agreement also addressed governance of the Dealerships (see Borrowing Agreement, third Whereas clause & § 3). Each Dealership "is managed by its members, [Darwish Auto] and [Darwish General]," which have "the right to make all decisions on behalf of" the Dealerships, "including . . . decisions regarding the acquisition, management, . . . [*2]operations, financing, accounting and sale of any or substantially all of . . . their assets" (id., § 3; see also NYSCEF Doc Nos. 853-862 [Dealership operating agreements]).
Darwish also entered into an employment agreement that became effective upon his purchase of the Dealerships (see NYSCEF Doc No. 748 ["Employment Agreement"]). In his role as "President" of the "New York Dealership Group," Darwish reported to the Governing Bodies, which had the discretion to "extend[] or curtail[]" his "duties and responsibilities" (id.). After an initial one-year term, Darwish was an at-will employee of the Companies, subject to "terminat[ion] at any time with or without cause" (id.).
B. This Litigation
In July 2022, a dispute arose regarding the Dealerships' bank accounts. After learning that TD Bank had allowed Darwish to modify access rights to the accounts, the Governing Bodies issued a resolution placing the accounts under their control (see NYSCEF Doc No. 15 ["Resolution"]).
At around the same time, the Governing Bodies directed Darwish to contact Stellantis, Ford, Mitsubishi, Nissan and Volkswagen (collectively, "Manufacturers") to obtain their approvals ("Manufacturer Approvals") to the governance changes worked by the April 18, 2022 agreements (see NYSCEF Doc No. 56).
Plaintiffs commenced this action on August 2, 2022, seeking a preliminary injunction directing TD Bank to comply with the access Resolution (see NYSCEF Doc No. 1). The Court granted the injunction over Darwish's objection, finding that the Companies "are likely to succeed in demonstrating that [the Governing Bodies] have the right to determine access to the bank accounts held in the name of [the Companies] or the Dealerships," and "Darwish does not have the unilateral authority to alter access to the accounts absent the approval of [the Governing Bodies]" (NYSCEF Doc No. 34 ["TD Bank Decision"] at 7).
Darwish served an amended answer with counterclaims on September 23, 2022 and commenced a third-party action against Frieder, Manzo and two other PAG-affiliated individuals, David Yusko and Melissa LaCarter (collectively, "Third-Party Defendants" or "TPDs") (see NYSCEF Doc Nos. 46-47).
Plaintiffs filed an amended complaint on October 13, 2022 (see NYSCEF Doc No. 51 ["Complaint"]) and moved for a second preliminary injunction shortly thereafter (see NYSCEF Doc Nos. 66-71), complaining that Darwish: (i) refused to request Manufacturer Approvals; (ii) modified access rights to the Manufacturers' digital portals ("Portals"); (iii) impeded the efforts of the Governing Bodies to oversee the Dealerships; and (iv) refused to cooperate in exploring the sale of underperforming Dealerships. 
For his part, Darwish moved to dismiss the Complaint on various grounds, including improper forum, lack of standing and failure to state a claim (see NYSCEF Doc No. 77). 
Prior to oral argument on the motions, the parties agreed to a temporary stipulation governing access rights to the Portals and other books and records (see NYSCEF Doc No. 227), as well as to pursue expedited private mediation. The case did not resolve through mediation, but plaintiffs did withdraw their injunction application based on the temporary stipulation.
In a Decision & Order dated April 26, 2023, the Court denied Darwish's dismissal motion, concluding that New York was a proper forum for this litigation, the Companies had standing to sue Darwish to enforce the Governance Agreements, and the claims in the Complaint were sufficiently pleaded (see NYSCEF Doc No. 232 ["MTD Decision"]).[FN3]

Darwish then answered the Complaint (see NYSCEF Doc No. 247 ["Answer"]), denying the pertinent allegations and alleging ten counterclaims/third-party claims.
Following joinder of issue, Darwish moved for a preliminary injunction granting him [*3]management authority over the Dealerships (see NYSCEF Doc Nos. 257-348). Darwish cited the Third-Party Defendants' "attempts to remove [him] as Dealer Principal and operator of the Dealerships," arguing that their actions "change[d] the status quo" and "almost guarantee[d] that the manufacturers will terminate the Dealerships" (NYSCEF Doc No. 346 at 1-2). 
The Court denied the injunction motion on November 2, 2023, reasoning:
Darwish has not demonstrated a reasonable probability of success on his claims that the Governance Agreements were never effective or that he is an oppressed minority shareholder/member. Nor has Darwish shown that he is likely to succeed in establishing that he is the authorized manager of the Dealerships or that he is being denied management rights granted to him by the Governance Agreements.
Darwish has shown the prospect of irreparable harm through the potential loss of Dealership franchises, but that harm has not been shown to be imminent.
Further, the harm that Darwish seeks to avoid largely is self-created, and the requested injunction may itself cause irreparable harm to the Companies and Dealerships. As such, Darwish has not shown that the balance of equities tips in favor of . . . even an injunction limited to restoring the status quo (NYSCEF Doc No. 500 ["2023 PI Decision"] at 26-27).
The parties then proceeded to expedited discovery under the able supervision of Hon. Thomas A. Stander (Ret.), who served as Special Referee.
On July 16, 2024, with discovery nearing a close, plaintiffs moved for partial summary judgment on their Complaint (see NYSCEF Doc No. 742).
At around the same time, Darwish moved for another preliminary injunction, this time seeking to restrain the Companies and Third-Party Defendants from selling any of the Dealerships during the pendency of this action (see NYSCEF Doc No. 763). The Court granted Darwish's motion on September 12, 2024, relying chiefly on the irreparable harm that Darwish may suffer "through the potential loss of the Dealerships and their associated real estate" prior to an adjudication of the merits of his claims/defenses concerning governance and ownership of the Companies and Dealerships (NYSCEF Doc No. 965 ["Dealership PI"] at 5-6). 
The preliminary injunction was conditioned upon Darwish posting an undertaking of $3 million ("Undertaking"), an amount fixed by reference to the potential diminution in value of the Companies and Dealerships while the injunction remained in effect (see id. at 8-9). Darwish was required to post the Undertaking within thirty (30) days; otherwise, "plaintiffs may move on notice to vacate the preliminary injunction" (id. at 10).
Darwish did not post the Undertaking; instead, he moved on the thirtieth day, October 10, 2024, for (i) renewal and reargument as to the amount of the Undertaking, and (ii) an additional thirty days from determination of the motion to post the Undertaking (see NYSCEF Doc No. 988). For their part, the Companies moved on October 15, 2024 to dissolve the preliminary injunction due to the lack of an Undertaking (see NYSCEF Doc No. 1021). 
C. Summary Judgment Motions
The Complaint alleges three causes of action: (i) request for a declaration concerning governance of the Companies and Dealerships (see Complaint, ¶ 72 [a]); (ii) breach of fiduciary duty (see id., ¶ 77); and (iii) breach of the Employment Agreement and Governance Agreements (see id., ¶¶ 80-82). Plaintiffs now move for the requested declaration and for partial summary judgment as to liability on their claims for breach of contract and breach of fiduciary duty.
Darwish opposes the motion, arguing primarily that (i) the pertinent documents show that the Companies "have no power over the Dealerships because they are not owners" (NYSCEF Doc No. 811 ["Opp Mem"] at 1), and (ii) the Governance Agreements "were never effective" (id. at 6). Darwish further contends that the relief sought by plaintiffs would defeat his reasonable expectations as owner of the Companies, member/director of the Governing Bodies and Dealer Principal (see id. at 15-17).
On his cross motion, Darwish argues principally that the Third-Party Defendants [*4]breached their fiduciary duties by engaging in oppressive and self-dealing conduct intended to cause financial harm to the Dealerships in order to force a sale (see id. at 18). Darwish also focuses on the Third-Party Defendants' alleged misuse of a banking token (see id. at 20-21).
II. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
The movant for summary judgment "has the burden to establish a prima facie showing of entitlement to judgment as a matter of law" by "tendering sufficient evidence to demonstrate the absence of material issues of fact" (Voss v Netherlands Ins. Co., 22 NY3d 728, 734 [2014] [internal quotation marks and citation omitted]). The failure to make such a showing "requires denial of the motion" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). 
If the movant makes the requisite showing, the burden shifts to the party opposing summary judgment to demonstrate, by admissible proof, the existence of a triable issue of fact or legal defense (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). All evidence must be viewed in the light most favorable to the non-movant (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), but "mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient to defeat summary judgment" (Justinian Capital SPC v WestLB AG, 28 NY3d 160, 168 [2016] [internal quotation marks and citations omitted]).
A. Declaratory Judgment
The primary relief sought by plaintiffs is a declaration that the Governing Bodies have the power to manage, direct and control the business, property and affairs of the Companies and Dealerships, including the right to sell one or more Dealerships (see Complaint, ¶ 72 [a]). 
1. Plaintiffs' Prima Facie Case
Plaintiffs have met their initial burden by submitting the documentary evidence discussed in Part I (A), supra. "The operating agreement for Darwish Auto, dated April 18, 2022, delegated the duties and responsibility of managing Darwish Auto to a management committee; as the sole member of Darwish Auto, [Darwish] signed a document appointing himself, Barry Frieder and Mark Manzo as Darwish Auto's management committee on the same day" (224 AD3d at 1117). "Similarly, the shareholders agreement for Darwish General, with the same date, delegated the duties and responsibilities of managing Darwish General to a board of directors and, as the sole shareholder, [Darwish] signed a document appointing the same trio as Darwish General's board of directors on that day" (id.). "The operating agreement, the shareholders agreement and the two documents appointing the governing bodies — all of which bear [Darwish]'s signature — establish," prima facie, "that the management of [the Companies] was delegated to their respective governing bodies" (id. at 1118).[FN4]

2. Dealership Operating Agreements
In opposition, Darwish first argues that the operating agreements for the Dealership limited liability companies ("Dealership LLCs") (see NYSCEF Doc Nos. 853-862 ["Dealership OAs"]) establish that he is their "owner and only decision maker" (Opp Mem at 2). Darwish emphasizes language therein identifying him as the "initial limited liability company member" (see e.g. NYSCEF Doc No. 853, § 2) and vesting management in the "members" (id., § 6). Darwish recognizes that the Dealership OAs go on to declare that Darwish Auto and Darwish General are the "members" and "owner[s]" of the Dealerships (id., § 3), but he argues that such language merely gives rise to an ambiguity that must be resolved at trial (see Opp Mem at 3-4).
The Court must be "guided by basic principles of contract interpretation which instruct that a contract should be construed to give effect to the parties' intent as gleaned from the four corners of the document itself, provided that its terms are clear and unambiguous" (Elmira Teachers' Assn. v Elmira City School Dist., 53 AD3d 757, 759 [3d Dept 2008], lv denied 11 NY3d 709 [2008]). Contract language must be interpreted in accordance with the plain and [*5]ordinary meaning of the words used (see id.; see also South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 277 [2005]). "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby" (Atwater & Co. v Panama R.R. Co., 246 NY 519, 524 [1927]).
The Court has examined the Dealership OAs on several occasions, most recently observing that they "are not a model of drafting clarity" (2023 PI Decision at 16). Nonetheless, construing the agreements as a whole and giving due regard to their text, structure and purpose, the Court is satisfied that the agreements evince the parties' intention that Darwish Auto and Darwish General shall be the two "limited liability company member[s]" of the Dealership LLCs, based upon "capital contribution[s]" made "in exchange for their LLC ownership" (see e.g. NYSCEF Doc No. 853, § 3 [emphasis added]). In contrast, the Dealership OAs merely identify Darwish as an "initial . . . member" (id., § 2 [emphasis added]), apparently in recognition of his role as organizer.
Support for this reading of the Dealership OAs is found in another operating agreement executed by Darwish at around the same time. In June 2021, Darwish signed the initial operating agreement for Darwish Auto (see NYSCEF Doc No. 816 ["Initial Operating Agreement"]), as well as the initial bylaws for Darwish General (see NYSCEF Doc No. 817 ["Initial Bylaws"]). Under these agreements (collectively, "Initial Agreements"]), Darwish was the sole member and manager of Darwish Auto and the sole director of Darwish General (see Initial Operating Agreement, §§ 2-3, 6; Initial Bylaws, art 3, § 2). But unlike the Dealership OAs, the Initial Operating Agreement identifies Darwish both as the "initial limited liability company member" and as the "limited liability company member" who made a "capital contribution . . . in exchange for [his] LLC ownership" (Initial Operating Agreement, §§ 2-3). 
Thus, under the Initial Agreements, Darwish owned and operated the Companies, and the Companies owned and operated the Dealerships. However, the April 18, 2022 agreements between and among Darwish and the Lenders modified that structure to reflect the Lenders' substantial bargained-for "right to oversee the management of the [Dealerships]" (Borrowing Agreement at 1 [final Whereas clause]; see also 224 AD3d at 1117 n 2). 
Through the Borrowing Agreement and Governance Agreements, executed together on April 18, 2022, management of the Companies became vested in the Governing Bodies, rather than in Darwish alone. But the Borrowing Agreement left intact the governance structure of the Dealerships, which would continue to be "managed by [their] members, [Darwish Auto] and [Darwish General], each of which has the right to make all decisions on behalf of each of the Dealership[s]" (Borrowing Agreement, § 3). 
Further confirmation of plaintiffs' position is found in the Contribution Agreement, another agreement signed by Darwish and the Lenders on April 18, 2022 (see NYSCEF Doc No. 786 ["Contribution Agreement"]). The Contribution Agreement expressly recognized that "Darwish Auto Group and Darwish General[] each own [50%] of the membership interests in [the Dealerships]" (id., second Whereas clause).
The foregoing agreements and acknowledgments concerning the Dealerships are consistent with the formal admission in Darwish's verified answer (see Answer, ¶ 2), as well as with Darwish's sworn testimony in this action (see e.g. NYSCEF Doc No. 141, ¶ 10 ["Darwish Auto Group and Darwish General own ten automotive dealerships"]; NYSCEF Doc No. 87, ¶ 3 ["I am the only owner of Darwish General and Darwish Auto Group. Those entities own ten automotive dealerships"]).
Based on the foregoing, the Court concludes as a matter of law that Darwish Auto and Darwish General are the members and managers of the Dealership LLCs.
3. "Never Effective"
Darwish next argues that the Governance Agreements were "never effective," and the Companies continue to be managed under the Initial Agreements (NYSCEF Doc No. 807 ["Darwish Aff."], ¶ 8). Darwish offers a host of grounds for his "never effective" argument, including: (i) the Governance Agreements were never approved by the Manufacturers, (ii) [*6]Darwish signed the Governance Agreements only as signature pages, (iii) the parties' post-closing conduct demonstrates that the Governance Agreements were never effective, (iv) the Companies waived and/or abandoned their rights under the Governance Agreements, (v) equitable estoppel, (vi) unclean hands, (vii) repudiation, (viii) breach of the Manufacturer Agreements, and (ix) fraudulent inducement (see Opp Mem at 6-15). 
Darwish's "never effective" contentions were first addressed in the TD Bank Decision, with the Court concluding that "plaintiffs are likely to succeed in demonstrating that their respective [Governing Bodies] have the right to determine access to the bank accounts held in the name of plaintiffs or the Dealerships" (TD Bank Decision at 7). 
The Court returned to the issue in the MTD Decision, concluding that the Initial Agreements, which could be amended by the entity owners (see Initial Operating Agreement, § 15; Initial Bylaws, art 6, § 6), had been "superseded by the Governance Agreements that Darwish signed on April 18, 2022" (MTD Decision at 12).
As previously stated, the Governance Agreements are "the sole and entire agreement of the [parties] with respect to [the Companies' management], and supersede[] all prior and contemporaneous understandings, agreements [and] representations . . . , both written and oral, with respect to [that] subject matter" (Operating Agreement, § 11.12; Shareholder Agreement, § 11.12). By their express terms, the Governance Agreements were intended to supersede the Initial Agreements.
Consistent with that understanding, Darwish's long-time counsel, who also served as counsel to Darwish Auto at the time, filed a Certificate of Amendment with the New York Secretary of State, reflecting the new management structure established by the Operating Agreement dated April 18, 2022 (see NYSCEF Doc No. 746; see also Frieder Aff., ¶ 11). 
a. Not Submitted to Manufacturers
In continuing to maintain that the Governance Agreements were never effective, Darwish first points to the fact that they "were never submitted to the Manufacturers until they were unilaterally submitted months later by individuals working for the [Lenders]" (Darwish Aff., ¶ 8). But, as plaintiffs properly observe, the Governance Agreements did not call for the approval of the Manufacturers or make their approval a condition precedent to effectiveness. 
Moreover, the issue of Manufacturer Approvals is addressed in the Contribution Agreement, which was executed contemporaneously with the Governance Agreements and Borrowing Agreement. The Contribution Agreement reflects the parties' mutual understanding that they would work together to obtain Manufacturer Approvals following execution of the April 18, 2022 agreements (see Contribution Agreement, § 5 [making Manufacturer Approvals a condition precedent to a closing thereunder]; see also BWA Corp. v Alltrans Express U.S.A., 112 AD2d 850, 852 [1st Dept 1985] ["Where several instruments constitute part of the same transaction, they must be interpreted together."]). 
b. Lack of Opportunity to Review Before Signing
Darwish next contends that he "did not have the opportunity to review and read" the April 18, 2022 agreements (Darwish Aff., ¶ 53): "During the closing, [the Lenders] continued to make changes to documents [and] . . . handed me signature pages to sign without providing me the opportunity to review the documents. I do not even know if the documents being used by them in this motion are actually the documents I signed" (id.). "During my deposition, I had the opportunity to review some of the documents. They are wrong on their face. For instance, the amount of money being loaned is wrong. Also, the signatures contain dates when I did not sign any documents" (id., ¶ 54). 
These contentions lack merit. Darwish was represented by sophisticated counsel at all pertinent times (see NYSCEF Doc No. 760 at 11-16); his counsel's regular practice was to review, and to have his client review, all documents before signing (see id. at 21-22, 27, 34, 51-52); and there is no evidence that Darwish was prevented from conferring with his counsel regarding any last-minute changes or from taking the time to read the agreements before signing [*7]them.[FN5]
Further, Darwish's counsel testified that he provided Darwish with effective representation in connection with the April 18, 2022 agreements (see id. at 22), and Darwish makes no claim to the contrary (see NYSCEF Doc No. 810, ¶¶ 29-30).[FN6]

Thus, even if Darwish assented to a complex $62 million commercial transaction by signing agreements without reading them or discussing them with his counsel, he "is conclusively bound by [their] terms" (Ferrarella v Godt, 131 AD3d 563, 567-568 [2d Dept 2015] [internal quotation marks and citation omitted], lv denied 26 NY3d 913 [2015]; see also Chimart Assocs. v Paul, 66 NY2d 570, 571 [1986, Kaye, J.] ["Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that . . . the writing did not express his own understanding of the oral agreement reached during negotiations."]). 
c. Post-Closing Conduct
Darwish next argues that the parties' post-closing conduct demonstrates that the Governance Agreements never became effective. Darwish refers primarily to the parties' dealings with the Manufacturers, as well as the Third-Party Defendants "act[ing] as if Darwish was the only person that could make decisions" (Opp Mem at 7; see Darwish Aff., ¶ 8).
Although a "course of conduct under a contract" may be "persuasive evidence of [the parties'] agreed intention" (Matter of Carol B. v Sanford B., 54 AD3d 653, 654 [1st Dept 2008]), the evidence adduced by Darwish falls well short of demonstrating a mutual intention to deprive the fully-executed Governance Agreements of effect.
Darwish seizes on language in an April 28, 2022 letter from the Lenders to Volkswagen, representing that the Lenders "have no ownership interest or right to an ownership interest in [the VW Dealership]" (NYSCEF Doc No. 841). But that statement is entirely consistent with the Governance Agreements, which provided for the Dealerships' continued management by their members, Darwish Auto and Darwish General. And the Lenders neither had nor claimed a present ownership interest in the Dealerships at the time; as carefully articulated in the letter, the Lenders would have "no ownership interest in or right to an ownership interest [in the Dealerships] without the appropriate manufacturer approval" (id. [emphasis added]). This is consistent with the Contribution Agreement, which makes Manufacturer Approvals a condition precedent to closing (see Contribution Agreement, § 5).
Darwish's broader claim, that the parties acted as if he were the sole decisionmaker, is belied by overwhelming evidence that the Governing Bodies repeatedly attempted to exercise their management prerogatives (see e.g. Part II [B], infra). Only Darwish "acted as if Darwish was the only person that could make decisions" (Opp Mem at 7).
d. Inconsistency with Manufacturer Agreements
Darwish also relies on the Manufacturer Agreements, which assign him certain roles and prohibit anyone else from serving in those roles without the consent of the Manufacturers. As the Court recognized in the 2023 PI Decision, the Manufacturer Agreements contemplate Darwish's active involvement in the management of the Dealerships to varying but substantial [*8]degrees (see 2023 PI Decision at 18-19; see also Part II [A] [4], infra).
But even if there is some irreconcilable conflict between Darwish's role as Dealer Principal and the April 18, 2022 agreements calling for the Companies to be managed by three-member Governing Bodies, that conflict does not give rise to the reasonable inference that the parties intended to disregard the Governance Agreements and operate under the Initial Agreements.
To the contrary, the Contribution Agreement, executed as part of the same transaction, contemplated a process of engagement with the Manufacturers following execution of the Governance and financing agreements (see Contribution Agreement, § 5). And the Borrowing Agreement, also executed simultaneously, contemplated that the engagement process would be conducted under the supervision of the Governing Bodies (see Borrowing Agreement, §§ 1-2; see BWA, 112 AD2d at 852). 
As the Court recognized, this approach created the "real and substantial prospect that one or more Manufacturers may terminate their franchise agreements" for breach (2023 PI Decision at 21; see e.g. WD Schen 2 LLC v Volkswagen Group of America, Inc., Albany County Index No. 907839-23). However, the parties' mutual decision to proceed in a manner that may have violated the rights of the Manufacturers and jeopardized the Dealership franchises is not evidence that the parties intended the Governance Agreements to be ineffective or unenforceable.
e. Fraud
Darwish argues that the Governance Agreements are the product of fraud, asserting that Alan Potamkin and Robert Potamkin misled him into believing that he would own and manage the Dealerships without interference and that PAG and its affiliates would serve solely as lenders (see Darwish Aff., ¶¶ 12-15). Additionally, Darwish appears to allege that he was defrauded by the Lenders' representations to the Manufacturers "that they would not control or manage [the Companies]" and would "just serve as lenders" (id., ¶ 49).
The elements of fraudulent inducement are "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]).
Even assuming that Darwish's allegations of fraudulent inducement are not barred by the broad merger clauses of the Governance Agreements, which "supersede[] all prior and contemporaneous understanding, agreements, representations and warranties, both written and oral, with respect to the subject matter" (Operating Agreement, § 11.12; see Rosenblum v Glogoff, 96 AD3d 514, 514-515 [1st Dept 2012]), the defense fails for lack of justifiable reliance. The falsity of the alleged misrepresentations concerning ownership and control of the Companies and Dealerships was apparent from the face of the agreements signed by Darwish on April 18, 2022. And any failure on Darwish's part to read the final version of those agreements or review them with counsel "prevents [Darwish] from establishing justifiable reliance" (Sorenson v Bridge Capital Corp., 52 AD3d 265, 266 [1st Dept 2008], lv dismissed 12 NY3d 748 [2009]).[FN7]

Insofar as Darwish claims to have been defrauded by the Lenders' representations to the Manufacturers, the representations appear to have been made after execution of the Governance and financing agreements, thereby defeating a claim that the representations induced their execution. In any event, Darwish has not adequately particularized the misrepresentations or concealments upon which he is relying, which is an additional ground for rejecting the defense (see CPLR 3016 [b]; El Entertainment U.S. LP v Real Talk Entertainment, Inc., 85 AD3d 561, 562 [1st Dept 2014] [party alleging fraud must identify who made the misrepresentations, when they were made, and what was said]).
[*9]f. Remaining Affirmative Defenses
The remaining affirmative defenses invoked by Darwish, including waiver, modification, abandonment, estoppel and unclean hands, have not been shown to be meritorious. Darwish and his counsel invoke these defenses through citations to a hodgepodge of seemingly inapposite cases, without making any attempt to relate the cases and legal doctrines to the particular facts of this case (see e.g. Opp Mem at 8-10; see also NYSCEF Doc No. 971 at 10-11). This is insufficient to give rise to a viable legal defense or triable issue of fact.
4. Oppression
Darwish contends that granting the relief sought by the Companies would defeat his reasonable expectations as the sole shareholder of Darwish Auto, the sole member of Darwish General, and the Dealer Principal of each Dealership (see Opp Mem at 15).[FN8]

Darwish relies on cases involving Business Corporation Law ("BCL") § 1104-a (a) (1), which authorizes a minority shareholder with at least 20% of the voting interest in a corporation to petition for judicial dissolution on the ground that the "directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders" (emphasis added). Oppression, in this context, refers to conduct that substantially defeats the reasonable expectations of the minority shareholder. But majority conduct is not oppressive simply because the minority shareholder's subjective hopes and desires are not fulfilled; rather, oppression "aris[es] only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the [minority shareholder's] decision to join the venture" (Matter of Kemp & Beatley [Gardstein], 64 NY2d 63, 73 [1984]).
In examining Darwish's reasonable expectations, the Court begins with the April 18, 2022 agreements governing (i) ownership and management of the Companies and Dealerships, and (ii) Darwish's employment.
The Governance Agreements vest management of the Companies in their Governing Bodies, and the Dealership OAs vest management of the Dealerships in the Companies, acting through the Governing Bodies. This is consistent with the governance framework to which Darwish assented in the Borrowing Agreement (see Part II [A] [2], supra). 
Under the Employment Agreement, Darwish reported to the Governing Bodies, who could "extend[] or curtail[]" his employment "responsibilities . . . from time to time in their discretion" (Employment Agreement at 1). As an employee, Darwish was obliged to "follow all policies and procedures adopted by the Governing [Bodies]," as well as "the policies and procedures established from time to time by [the Lenders]" (id. at 3). And Darwish was an "employee 'at will'" of the Companies who could be "terminated at any time . . . without cause" after an initial one-year term (id.; see also NYSCEF Doc No. 871 at 2).
As to long-term expectations, Darwish assented to a Contribution Agreement that contemplated the transfer of the Dealerships to a new entity in which Darwish would hold only a 35% ownership interest (see Contribution Agreement, §§ 2, 5).
Having entered into a comprehensive set of written agreements that establish and/or confirm (i) the ownership and management structure of the Companies and Dealerships, (ii) Darwish's rights and responsibilities as an employee of the Companies, and (iii) the covenants that Darwish and the Companies gave to the Lenders in order to obtain financing, Darwish could not have had any reasonable expectation of ownership, management or employment rights beyond those conferred in the comprehensive written agreements of April 18, 2022.
Darwish particularly objects to the sale of Dealerships, claiming that he had "a reasonable expectation to approve or disapprove of a sale" (Opp Mem at 15). But the Governance [*10]Agreements vest those decisions in the Governing Bodies, and the Borrowing Agreement confirms that the Governing Bodies "have the right, power and authority" to sell Dealerships (see Borrowing Agreement, §§ 1-2). Darwish could not reasonably expect to have veto power over the sale of a Dealership after assenting to the April 18, 2022 agreements.
Darwish also relies on "expectations formed through the Manufacturer Agreements, which, to varying degrees, contemplate his active involvement in the operations and management of the Dealerships" (2023 PI Decision at 18).[FN9]
But any expectations that Darwish derived from the Manufacturer Agreements cannot be viewed in isolation from the host of promises that Darwish made to the Lenders to obtain the $62 million in financing he needed to take advantage of the "lucrative" opportunity to purchase the "Fuccillo" Dealerships (Darwish Aff., ¶ 2). By executing the April 18, 2022 agreements with the Lenders to obtain that financing, Darwish relegated himself to a minority role in the management of the Companies and Dealerships.
Additionally, the Manufacturer Agreements were not fully executed until after Darwish signed the April 18, 2022 agreements.[FN10]
Accordingly, any expectations formed through the Manufacturer Agreements could not have been central to Darwish's decision to enter into the Governance Agreements.
Moreover, Darwish's expectations regarding his role in managing and operating the Dealerships cannot be divorced from the Companies' countervailing expectations regarding Darwish's conduct. The pertinent agreements obliged Darwish to comply with the governance structure to which he assented, adhere to the directives of the Governing Bodies and act as a responsible steward of the Dealerships and their resources. Plaintiffs submit abundant proof that this did not happen (see Part II [B], infra).
Finally, it bears emphasis that the oppression doctrine focuses on actions taken by the majority against the owner of a substantial minority interest. But Darwish is the 100% owner of the Companies (and 100% indirect owner of the Dealerships), and the claimed oppression arises directly from the contractual promises that Darwish made to the Lenders to finance his purchase of these ownership interests. Insofar as Darwish is oppressed by the ownership, governance and management structure to which he assented, his complaint is one of self-oppression.
Accordingly, even if principles of minority shareholder oppression under BCL § 1104-a (a) (1) bear on the effectiveness and/or enforceability of the Governance Agreements, Darwish has not shown that plaintiffs or the Third-Party Defendants defeated any reasonable expectations that were central to his decision to enter the venture.
5. Conclusion
Based on the foregoing, plaintiffs have demonstrated their entitlement as a matter of law to the following declarations:
i. A majority of the members of the Management Committee of Darwish Auto has the [*11]power to manage, direct and control the business, property and affairs of Darwish Auto, including the right to sell its interest in the Dealerships, without interference from Darwish.
ii. A majority of the members of the Board of Directors of Darwish General has the power to manage, direct and control the business, property and affairs of Darwish General, including the right to sell its interest in the Dealerships, without interference from Darwish.
iii. Darwish Auto and Darwish General, acting through their Management Committee and Board of Directors, respectively, have the power to manage, direct and control the business, property and affairs of the Dealerships, of which Darwish Auto and Darwish General each hold 50% membership interests.
iv. Darwish has no right to take any action relative to potential Dealership sales, Dealership facilities, management, accounting and other systems and employees, except as authorized by a majority of the members of the Management Committee and the Board of Directors.
B. Breach of Contract
Plaintiffs move for partial summary judgment as to liability on their third cause of action, alleging that Darwish breached the Governance Agreements and Employment Agreement (see MOL at 8; Complaint, ¶¶ 79-83). To prevail, plaintiffs must establish the formation of valid contracts, Darwish's breaches, and the Companies' own performance (see Clearmont Prop., LLC v Eisner, 58 AD3d 1052, 1055 [3d Dept 2009]).
For the reasons stated in Part II (A), supra, the Governance Agreements and Employment Agreement are valid and enforceable contracts and the Companies performed thereunder.
As to breach, plaintiffs submit overwhelming evidence that Darwish refused to "report to the [Governing Bodies]" and "follow all policies and procedures adopted by the Governing Bod[ies]" (Employment Agreement at 1, 3; see Frieder Aff., ¶¶ 20-24). Indeed, Darwish denies that the Governing Bodies ever came into existence, insisting that the parties "never came to an agreement" that was "finalized" (NYSCEF Doc No. 756 ["Darwish EBT"] at 94).
Darwish's recalcitrance was most pronounced in regard to a potential sale of a Dealerships. On July 22, 2022, the Governing Bodies directed Frieder and Manzo "to explore a potential sale of one or more of the Dealerships" (NYSCEF Doc No. 753, Ex. D to Ex. A).[FN11]
A business broker responded to these efforts on August 8, 2022 by conveying an offer to purchase one of the Dealerships (see Frieder Aff., ¶ 22). Darwish's counsel responded as follows: "The dealerships are not for sale. Please refrain from any marketing efforts you are taking" (NYSCEF Doc No. 754).
Through the foregoing proof, plaintiffs have demonstrated, prima facie, that Darwish breached his Employment Agreement.
In opposition, Darwish relies on the same defenses that were rejected in Part II (A), supra: the Governance Agreements were "never effective," the Initial Agreements are controlling, and Darwish is the sole member and manager of the Dealerships. 
Accordingly, plaintiffs are awarded partial summary judgment as to Darwish's liability for breach of the Employment Agreement, with their damages, if any, to be proven at trial (see Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 402 [1993] [nominal damages always [*12]available]).[FN12]

C. Breach of Fiduciary Duty
The final branch of plaintiffs' motion seeks partial summary judgment as to Darwish's liability for breach of fiduciary duty (see Complaint, ¶¶ 74-78). Plaintiffs maintain that Darwish breached fiduciary duties owed to the Companies by converting $4.77 million in Manufacturer advances to his own personal benefit (see MOL at 12-13). 

A claim for breach of fiduciary duty "requires the existence of a fiduciary relationship, misconduct by the defendant[] and damages directly caused by the misconduct" (Testani v Russell & Russell, LLC, 204 AD3d 1260, 1262 [3d Dept 2022]). 
Plaintiffs assert, without contradiction, that Darwish owed them fiduciary duties by reason of his role as a member/manager and shareholder/director of the Companies.
As to misconduct, plaintiffs submit proof that Darwish received about $4.77 million in advances against future Dealership profits from Ford and Nissan Extended Services North America ("NESNA")[FN13]
and converted the advances to his personal benefit (see MOL at 12).
Darwish received a $3.75 million advance from Ford in July 2022 against future profits from the Ford Dealerships' sale of finance and insurance products ("Ford Advance") (see Darwish EBT at 169-170). Darwish deposited the Ford Advance in his personal checking account (see id. at 165). 
Under the Dealer Marketing Advance Agreement between Ford and the Ford Dealerships (see NYSCEF Doc No. 750 ["Ford Agreement"]), the $3.75 million represented an advance of marketing incentive funds that the Ford Dealerships expected to earn over five years (see id., §§ 2-6), and Darwish signed the agreement "on behalf of the Dealership[s] as [their] President" (id. at 4). If the Ford Dealerships did not sell the expected number of contracts, the unearned portion of the Ford Advance would have to be repaid (see id., §§ 3-4, 6).
Darwish received a similar advance of $1.02 million from NESNA in or around August 2022 ("NESNA Advance") (see NYSCEF Doc No. 751 ["NESNA Agreement"]). The agreement between the Dealerships and NESNA states that Darwish received the advance in a fiduciary capacity: Darwish shall "collect amounts due . . . and shall hold amounts due the [Dealerships] in a fiduciary capacity as trustee for the [Dealerships] until remitted to and received by the [Dealerships]" (id., § 1 [e]). The NESNA Advance was wired to Darwish's personal checking account (see Darwish EBT at 179).
By March 27, 2024, Darwish had spent all but about $200,000 of the $4.77 million in advances from Ford and NESNA (collectively, "Advances") (see id. at 170). Darwish used the funds to pay off his home mortgage, purchase a home for his parents, pay off various debts, and assist his brother in starting a mixed-martial-arts league (see id. at 170, 179, 191; see also NYSCEF Doc No. 964 at 6-8).
The Advances were not recorded in the financial books and records of the Dealerships and were not disclosed on the Companies' or Dealerships' financial statements (see Frieder Aff., ¶ 31). The Advances were discovered only because of a shortfall in the sale of finance and insurance products that resulted in the need for "true-up" payments/debits (see id., ¶¶ 28-29).
Finally, plaintiffs have submitted proof of damages: "The Ford Advance is being repaid with funds that the Ford Dealerships would have otherwise received from the sale of finance and insurance products offered by Ford, which deprives the Ford Dealerships from the income that [*13]they would have otherwise received from the sale of those products. In addition, because the income from the sale of finance and insurance products offered by Ford is not sufficient to repay the $3.75M Ford Advance, the Ford Dealerships have been repaying the advance with their own funds, which are rapidly dwindling" (id., ¶ 32). The same is true of the NESNA Advance (see id., ¶ 33).
The foregoing proof demonstrates, prima facie, that Darwish breached fiduciary duties owed to the Companies by converting the Advances to his own benefit.
In opposition, Darwish insists that the Advances were part of his "normal compensation" as Dealer Principal (Darwish Aff., ¶ 77). He also claims to have informed Frieder and Manzo on April 5, 2022 that he "would be seeking . . . advances from manufacturers once the Dealerships were acquired" (id., ¶ 78; see NYSCEF Doc No. 871 [email exchange]).[FN14]

Darwish attests that Ford emailed him on June 17, 2022 in connection with a "meeting to review and update important information regarding [Darwish's] reinsurance formation and Dealer Advance" (NYSCEF Doc No. 874; see Darwish Aff., ¶ 81), and he signed the Ford Agreement on June 25, 2022 (see Darwish Aff., ¶ 82). "During discussions regarding the Funds, Ford asked [Darwish] how [he] intended to spend the money and even jokingly suggested [he] use the Funds to purchase a boat" (id., ¶ 83). Darwish received a check from Ford, made out in his name, on June 29, 2022 (see id., ¶¶ 84-85).
As to the NESNA Advance, Darwish attests that "[o]n September 12, 2022, [he] received the advance from [NESNA] since Nissan properly placed those funds into [his] personal bank account" (id., ¶ 80). Darwish also observes that he personally guaranteed the advanced funds (see id., ¶ 79).
Responding to plaintiffs' claim that it was improper to convert the Advances to his own benefit, Darwish avers:
As Dealer Principal, I am responsible for these funds and any "True-Ups" that might occur as a result of Plaintiffs' mismanagement of my Dealerships. Therefore, if my Dealerships do not pay these "True-Ups", I will need to pay them personally.
As Dealer Principal, I also pay income tax on all funds that are income to my Dealerships.
"True-Ups" should not be necessary. For instance, Ford accounts for the money by reducing the amount advanced by $375,000.00 every six (6) months for a total of five (5) years as long as there are sufficient sales of vehicle service contracts and ancillary products. In the event that sales targets are not met, the Ford Dealerships will need to pay some money over the span of five (5) years. . . .
Under my leadership, we were projected to have sufficient sales, and would continue to, if I were permitted to continue to operate my Dealerships. However, Plaintiffs harmed my Dealerships extensively.
For instance, the Ford, Nissan and Mitsubishi Dealerships have been selling vehicle service contracts and ancillary products since the acquisition. Since TPDs have been in my Dealerships, they have intentionally harmed my dealerships causing significantly less sales. . . .
It is noteworthy that the manufacturers always treated these advances as my money. For instance, in an email from Ford to me, they refer to the funds as "your reinsurance formation and Dealer Advances" and it is clear that "Check will be made out to: Wally Darwish . . . .
I have also received some compensation from manufacturers as a result of victories in dealership competitions that were won while I was operating my Dealerships. As Dealer Principal, it is my role to direct those winnings. It is normal for a Dealer Principal to earn those winnings (id., ¶¶ 86-92).
The Court is unpersuaded by Darwish's arguments and contentions. The Advances were issued under contracts between the Manufacturers and Dealerships, with Darwish signing only in a representative capacity. Further, the Advances represent a prepayment of Dealership earnings from finance and insurance products over the life of a particular advance agreement, regardless of the potential need for true-up payments (see Frieder Aff., ¶¶ 32-33). 
Darwish's self-serving assertions aside, there simply is no evidentiary basis to conclude that the Advances were intended to be the personal compensation of the Dealer Principal or anything other than a corporate opportunity of the Dealerships (see Alexander & Alexander of NY v Fritzen, 147 AD2d 241, 246 [1st Dept 1989] ["corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation"]).
In fact, the NESNA Agreement makes explicit what is plainly implied in the Ford Agreement: Darwish was authorized to collect the Advances as a Dealership representative and to hold such funds as a fiduciary until remitted to the Dealership (see NESNA Agreement, § 1 [e]; see also Ford Agreement, § 15 [representation and warranty that Darwish is "authorized to enter (Ford) Agreement on behalf of the Dealership as the President of the Dealership"]).
Darwish therefore breached his fiduciary duties by converting the Advances to his personal benefit (see MacArthur v Doeblin, 224 AD3d 482, 483 [1st Dept 2024]; J-K Apparel Sales Co., Inc. v Jacobs, 189 AD3d 1011, 1013 [2d Dept 2020], lv denied 37 NY3d 1021 [2021]), and plaintiffs are entitled to partial summary judgment as to his liability for the breach.
III. DARWISH'S CROSS MOTION FOR SUMMARY JUDGMENT
Darwish alleges ten counterclaims/third-party claims: (1) fraud, (2) declaratory judgment, (3) accounting, (4) conversion, (5) breach of fiduciary duty, (6) civil conspiracy, (7) unjust enrichment, (8) promissory estoppel, (9) tortious interference and (10) indemnification (see Answer, Counterclaims, ¶¶ 87-155). Darwish cross-moves for partial summary judgment as to liability on his second through fifth causes of action.
A. Token-Based Claims
Darwish moves for summary judgment as to liability on his fourth cause of action for conversion, alleging that the Third-Party Defendants converted his "ownership in [a certain banking] token . . . and have wrongfully taken certain designated funds" through misuse of the token (id., ¶ 117). Additionally, the declaration sought by Darwish partially concerns the token (see id., ¶ 101), as do Darwish's claims for fraud (see id., ¶¶ 88-90) and breach of fiduciary duty (see id., ¶ 124).
"On or about July 26, 2022, Darwish determined [that the TPDs] worked together to have someone log into an online bank account with TD Bank using Darwish's login credentials and confidential bank token to mask several transactions" (id., ¶ 61). "Numerous wire transfers were made in Darwish's name, without Darwish's knowledge, permission, or authority on or about July 25, 2022 in the approximate amount of $219,000" (id., ¶ 62). The transfers "were approved by LaCarter who acted at the direction of Frieder, Manzo, and Yusko" (id., ¶ 64). "There was no legitimate reason for using [the] token, other than to mask the transactions" (id., ¶ 65). 
The tort of "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. The two essential elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights" (Colavito v New York Organ Donor Network, Inc., 8 NY3d 43, 49-50 [2006] [citations omitted]).
Although conversion claims usually involve tangible property, the Court of Appeals has recognized that the tort may extend to electronic records and other types of intangibles (see Thyroff v Nationwide Mut. Ins. Co., 8 NY3d 283, 292-293 [2007]). Darwish also invokes General Business Law § 380-s, which provides: "No person, firm, partnership, corporation, or association or employee thereof shall knowingly and with the intent to defraud, obtain, possess, transfer, use, or attempt to obtain, possess, transfer, or use credit, goods, services or anything else [*14]of value in the name of another person without his or her consent." 
Relying on his own testimony, Darwish maintains that Yusko used his banking token without approval, and LaCarter approved the resulting transactions (see Darwish Aff., ¶¶ 23-32). Darwish also refers to deposition testimony in which Yusko acknowledged the use of his token (see NYSCEF Doc No. 905 ["Yusko EBT"] at 63-65), and LaCarter acknowledged approving Yusko's transactions (see NYSCEF Doc No. 956 at 72-73, 76; see also Yusko EBT at 117). 
The Third-Party Defendants do not deny using Darwish's bank token, but they claim that Darwish authorized Yusko (and others) to use the token (see NYSCEF Doc No. 967 ["Yusko Aff."], ¶¶ 4-5; NYSCEF Doc No. 970, ¶¶ 11-12). According to Yusko, "permission" to use Darwish's token "was never withdrawn until July 26, 2022, when [Darwish] unilaterally instructed TD Bank to remove [Yusko's] authority to withdraw funds from the accounts" (Yusko Aff., ¶ 5). 
Darwish dismisses Yusko's testimony as "self-serving" (NYSCEF Doc No. 973 at 1) and claims that there is no writing evidencing the alleged grant of permission (id. at 21; but see Yusko Aff., ¶ 4 ["We all signed signature cards at TD Bank at the same time and in each other's presence"]). Darwish's proof, however, is equally "self-serving" (see e.g. NYSCEF Doc No. 973 at 21 ["To the contrary, Darwish has testified that he never gave Yusko any such authority"]).
The Court concludes that there are triable issues of fact as to whether Darwish authorized the Third-Party Defendants to use his banking token for the challenged transactions. 
Accordingly, summary judgment is denied as to Darwish's fourth counterclaim/third-party claim (and any other claims hinging on the token issue).
B. Breach of Fiduciary Duty
Darwish's fifth counterclaim/third-party claim alleges that the Third-Party Defendants breached fiduciary duties owed to him and the Companies (see Answer, Counterclaims, ¶¶ 122-123). "For instance, Third-Party Defendants have breached their duty of loyalty and/or fiduciary duty and other obligations by seeking to hide company money, misusing a token in order to disguise the source of certain transactions, and by paying amounts not owed" (id., ¶ 124). "Third-Party Defendants have also breached their obligations . . . by intentionally trying to harm the companies by, among other things, not paying money owed to the floor plan lender to try and blame Darwish and intentionally disrupting the Dealerships' operations" (id., ¶ 125).
In his moving papers, Darwish maintains that the excessive losses suffered by the Dealerships under the management of the Lender-controlled Governing Bodies, together with their "secret efforts" to sell Dealerships, support his claim that the Third-Party Defendants "intentionally caused massive losses at [the] Dealerships so that they could convince the Manufacturers to sell [the] Dealerships without [Darwish's] approval" (Darwish Aff., ¶ 106).[FN15]

Darwish avers that the Third-Party Defendants intentionally harmed the Dealerships by (i) reducing the price of used vehicles to below wholesale, (ii) advertising used vehicles for sale at a price lower than their replacement cost and (iii) excessive write-downs (see id., ¶ 107; see also id., ¶ 108 ["By writing down the price of the used vehicles, TPDs are selling vehicles and showing a fictitious profit for a short period of time."]). The Third-Party Defendants also allegedly "tanked new car sales," with the trend "declining dramatically since they took over" (id., ¶ 109).
After Darwish "was forced out," the Dealerships "began to lose money" (id., ¶ 111), and they "continue to be unprofitable" (id., ¶ 112). "Between January through June 2024, . . . [the Dealerships] generated $11,235,853 in gross profits with expenses of $14,843,900, for a net loss of ($3,608,048). Under [Darwish's] operation, [the] Dealerships generated more than $5 million more in gross profits and $4.5 million more in net profits" (id.; see also id., ¶ 113).
Darwish also cites the Third-Party Defendants' actions in: (i) causing "a massive exodus of employees" from the Dealerships; (ii) conspiring with the Lenders to create a default in order "to wrongfully and unilaterally take over the Dealerships"; (iii) misleading Dealership employees about court orders; and (iv) forcibly seizing control of certain Dealerships (id., ¶¶ 117-123).
Darwish supports the foregoing assertions of fiduciary misconduct with his own affidavit, along with affidavits from three former managers of the Companies/Dealerships: Liwaa Darwish, Jeffrey Benezra and Moe Shahin (see NYSCEF Doc Nos. 808, 812-813). Darwish also submits the affidavit of a forensic accountant, who opines that "the financial condition of the [Dealerships] deteriorated under the control of [the Governing Bodies]" (NYSCEF Doc No. 953, ¶ 4).[FN16]

Even assuming that the foregoing demonstrates that the Third-Party Defendants engaged in fiduciary misconduct that caused financial harm to the Companies and Dealerships, Darwish's own proof — and the important issues left unaddressed therein — gives rise to triable issues of fact that preclude the grant of partial summary judgment. 
As the Court stated in the 2023 PI Decision, issued in November 2023:
Darwish has not addressed the host of other factors that may be causing or contributing to the poor fiscal and operational performance of the Dealerships, including: (i) the larger market forces affecting vehicle prices and sales; (ii) the internal dissension and division within the Dealerships engendered by the parties' acrimonious relationship, together with the resulting turnover of Dealership personnel; and (iii) the financial improprieties alleged by plaintiffs, which involve the diversion of significant financial resources away from the Dealerships (2023 PI Decision at 24). Since then, "Darwish's misconduct has not only continued, but has turned out to be much more pervasive than initially believed" (Frieder Aff., ¶ 24). When the Court issued the 2023 PI Decision, plaintiffs' claim that Darwish diverted almost $5 million from the financially struggling Dealerships was simply an allegation, not a judicially-determined breach of Darwish's fiduciary duties to the Companies (see Part II [C], supra).
Based on the foregoing,[FN17]
 Darwish has not established his entitlement to summary judgment on his claim for breach of fiduciary duty. 
C. Remaining Claims
Darwish also moves for summary judgment on his claims for declaratory judgment and an accounting, but he has not established his initial entitlement to such relief.
Certain of the declarations requested by Darwish already have been rejected by the Court (e.g., the claim that the Companies lack authority to maintain this action), and others are redundant of Darwish's claims at law and/or give rise to triable issues of fact (e.g., alleged misuse of the banking token). 
And to obtain an equitable accounting, Darwish "must demonstrate that he . . . has no adequate remedy at law" (Atlantis Mgt. Group II LLC v Nabe, 177 AD3d 542, 543 [1st Dept 2019] [internal quotation marks and citation omitted]), a showing that has not been made on the present record. 
Accordingly, summary judgment is denied as to Darwish's second and third counterclaims/third-party claims.
IV. THE PRELIMINARY INJUNCTION
On September 12, 2024, the Court granted Darwish's motion for a preliminary injunction restraining the Companies and Third-Party Defendants from selling the Dealerships (and associated real estate) during the pendency of this action (see Dealership PI at 11). The injunction was conditioned on Darwish posting a $3 million Undertaking within thirty days; if not, "plaintiffs may move on notice to vacate the preliminary injunction" (id. at 10).
Exactly thirty days later, on October 10, 2024, Darwish moved under CPLR 2221 for reargument and renewal of the injunction motion, seeking to (i) reduce the Undertaking to a nominal sum, and (ii) extend his time to post the Undertaking until thirty days after determination of the reconsideration motion (see NYSCEF No. 988). For their part, plaintiffs moved on October 15, 2024 to dissolve the preliminary injunction due to Darwish's failure to post the Undertaking (see NYSCEF Doc No. 1021).[FN18]

Upon a grant of a preliminary injunction, "the plaintiff shall give an undertaking in an amount to be fixed by the court, that the plaintiff, if it is finally determined that he or she was not entitled to an injunction, will pay to the defendant all damages and costs which may be sustained by reason of the injunction" (CPLR 6312 [b]). 
In Bonded Concrete, Inc. v Town of Saugerties (42 AD3d 852 [3d Dept 2007]), the Third Department had "twice determined" on interlocutory appeals that "the initial issuance of the preliminary injunction" was proper, but the restrained plaintiff ultimately prevailed on summary judgment (id. at 855). In concluding that there had been "a final determination that [defendants were] not entitled to the injunctive relief," the Third Department relied upon the award of summary judgment to plaintiff, which included a favorable declaration of rights (id.). "[T]he final determination contemplated by CPLR 6312 (b)" is "an ultimate determination on the merits of whether the injunction was erroneously granted and should, at that later date, be vacated" (id. at 855-856, citing J.A. Preston Corp. v Fabrication Enters., 68 NY2d 397, 405-407 [1986]). 
Thus, Bonded Concrete teaches that a preliminary injunction should be vacated where the restrained party establishes on summary judgment that the claims/defenses supporting the injunction lack merit as a matter of law. 
Having awarded summary judgment to the Companies on their request for a declaratory judgment that (i) a majority of the members of the Governing Bodies have the power to manage the Companies, including the right to sell the Companies' interest in the Dealerships and their real estate, and (ii) Darwish has no right to interfere (see Part II [A] [5], supra), the Court concludes that the preliminary injunction restraining the Companies and Third-Party Defendants from exercising their management rights was erroneously granted and should be dissolved. However, the Court will briefly delay the effectiveness of its order dissolving the injunction until after the New Year to allow for an orderly response.
CONCLUSION
Based on the foregoing,[FN19]
it is
ORDERED, ADJUDGED and DECLARED that a majority of the members of the Management Committee of Darwish Auto has the power to manage, direct and control the business, property and affairs of Darwish Auto, including the right to sell its interest in the Dealerships, without interference from Darwish; and it is further
ORDERED, ADJUDGED and DECLARED that a majority of the members of the Board of Directors of Darwish General has the power to manage, direct and control the business, property and affairs of Darwish General, including the right to sell its interest in the Dealerships, without interference from Darwish; and it is further
ORDERED, ADJUDGED and DECLARED that Darwish Auto and Darwish General, acting through their Management Committee and Board of Directors, respectively, have the power to manage, direct and control the business, property and affairs of the Dealerships, of which Darwish Auto and Darwish General each hold a 50% membership interest, without interference from Darwish; and it is further
ORDERED, ADJUDGED and DECLARED that Darwish has no right to take any action relative to potential Dealership sales, Dealership facilities, management, accounting and other systems and employees, except as authorized by a majority of the members of the Management Committee and the Board of Directors; and it is further
ORDERED that plaintiffs are awarded partial summary judgment as to liability on their third cause of action, alleging breach of the Employment Agreement, in accordance with Part II (B), supra; and it is further
ORDERED that plaintiffs are awarded partial summary judgment as to liability on their second cause of action, alleging breach of fiduciary duty as to the Ford and NESNA Advances, in accordance with Part II (C), supra; and it is further
ORDERED that plaintiffs' motion is granted to the extent indicated in the preceding decretal paragraphs and is otherwise denied; and it is further
ORDERED that Darwish's cross motion for summary judgment is denied in accordance with Part III, supra; and it is further
ORDERED that plaintiffs' motion to dissolve the preliminary injunction is granted, and the September 12, 2024 order restraining the Companies and Third-Party Defendants from transferring or disposing of the Dealerships and their associated real estate during the pendency of this action shall be dissolved as of noon on January 8, 2025; and it is further
ORDERED that, notwithstanding the previous decretal paragraph, the Companies and Third-Party Defendants are restrained from transferring or disposing of the Dealerships and their associated real estate prior to noon on January 8, 2025; and it is further
ORDERED that Darwish's motions for reconsideration of the undertaking and to adjourn the posting of an undertaking are denied as academic; and finally it is
ORDERED that counsel shall appear for an in-person conference on February 11, 2025 at 11:00 a.m. to discuss, among other things, (i) the parties' willingness to pursue mediation or other form of alternative dispute resolution in advance of trial, and (ii) the scheduling of the trial.
This constitutes the Decision, Order & Interlocutory Judgment of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for plaintiffs shall promptly serve notice of entry on all parties entitled to such notice.
Dated: Albany, New York
December 30, 2024
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 742-789, 805-958, 963, 966-971, 973-985, 988-1012, 1021-1039, 1042-1051.[FN20]

Footnotes

Footnote 1: "Dealerships" refers to the following: (i) WD East Green, LLC d/b/a Wally's Ford of East Greenbush; (ii) WD Adams 2, LLC d/b/a Wally's Ford of Adams; (iii) WD Adams 3, LLC d/b/a Wally's Chrysler Jeep Dodge Ram of Adams; (iv) WD Amsterdam, LLC d/b/a Wally's Chrysler Jeep Dodge Ram of Amsterdam; (v) WD Nell 2, LLC d/b/a Wally's Chrysler Jeep Dodge Ram of Nelliston; (vi) WD Nell 3, LLC d/b/a Wally's Ford of Nelliston; (vii) WD Water 3, LLC d/b/a Wally's Mitsubishi of Watertown; (viii) WD Latham, LLC d/b/a Wally's Nissan of Latham (ix) WD Seneca, LLC d/b/a Wally's Ford of Seneca Falls; (x) WD Schen 2, LLC d/b/a Volkswagen of Schenectady.

Footnote 2: The Operating Agreement for Darwish Auto and the Shareholder Agreement for Darwish General shall be referred to collectively as the "Governance Agreements."

Footnote 3:The denial of Darwish's dismissal motion was affirmed on appeal, as was the issuance of the TD Bank injunction (see Darwish Auto Group, LLC v TD Bank, N.A., 224 AD3d 1115 [3d Dept 2024]).

Footnote 4: "[T]he granting or denial of a motion for a preliminary injunction does not constitute the law of the case" (Kaplan v Queens Optometric Assoc., P.C., 293 AD2d 449, 449 [2d Dept 2002] [internal quotation marks and citation omitted]), but plaintiffs' documentary evidence speaks for itself (see generally id. at 450). 

Footnote 5: A copy of the email between the Lenders' in-house counsel and Darwish's counsel, purporting to show that Darwish was handed only signature pages at the closing, does not substantiate Darwish's averments (see Darwish Aff., ¶ 53). The email is dated April 25, 2022, one week after the closing on the Governance Agreements, and the email pertains to different documents ("Mortgage and Loan Document Revisions") (NYSCEF Doc No. 863). Moreover, the Lenders' counsel expressly requested in the email that Darwish's counsel review some proposed changes, "and if acceptable, . . . respond with [Darwish's] okay on that" (id.).

Footnote 6: This is not a case like Globaltech, Inc. v Global Encasement, Inc. (2009 WL 3352751, *20-21 [ED NY, Mar. 12, 2009, No. 99 CV 4307 (CLP)]), relied upon by Darwish, in which a company president retyped certain pages of an agreement to make them more favorable to his employer and then surreptitiously replaced the pages and presented them to the other side for signature in a way that concealed and obscured his changes.

Footnote 7: Given that the true state of affairs was described in the documents given to Darwish for his signature, the Court also questions whether scienter reasonably can be inferred.

Footnote 8: It is unclear whether Darwish's oppression argument is a defense to plaintiffs' claim for a declaration of rights or a predicate for his third-party claim alleging breach of fiduciary duty. The Court will analyze it as both.

Footnote 9: For example, under the Dealer Sales and Service Agreement with Mitsubishi Motors, Darwish is identified as the "Dealer Principal" and "Owner," and the agreement prohibits any "change in the ownership . . . which results in a change in majority control or interest . . . without the prior written approval of [Mitsubishi]" (NYSCEF Doc No. 828). The same agreement represents that Darwish, as Dealer Principal and Executive Manager, has complete decision-making authority over dealership operations (see id.). The agreement with Nissan similarly designated Darwish as Principal Owner and Executive Manager, declared that Nissan has no obligation to transact business with anyone other than the Principal Owner or Executive Manager, and provided that the Executive Manager shall have full managerial authority over dealership operations and be physically present at the dealership (see NYSCEF Doc No. 825). Likewise, Stellantis entered into its dealership agreements in reliance "on the active, substantial and continuing personal participation in the management of Dealer's organization" by Darwish, who is designated as "Dealer Principal" (NYSCEF Doc No. 826).

Footnote 10: The Mitsubishi dealer agreement was signed by Darwish on January 25, 2022 but not counter-signed until May 2, 2022 (see NYSCEF Doc No. 828 at 6).

Footnote 11:At the same meeting, the Governing Bodies directed Darwish to contact and obtain Manufacturer Approvals, which he refused to do (see id.). Relatedly, these directives undermine Darwish's argument that "[a]ll parties conducted themselves . . . as if the original entity documents were . . . effective" (Darwish Aff., ¶ 8).

Footnote 12: Given Darwish's persistent breaches of his Employment Agreement, there is no merit to his claim that he "should receive the same compensation" as prior to his termination (Darwish Aff., ¶ 56; see id., ¶¶ 67-68).

Footnote 13: NESNA provides services in connection with Nissan, Infiniti and Mitsubishi vehicles (see Frieder Aff., ¶ 26 & n 1).

Footnote 14: As plaintiffs observe in reply, the email exchange does not support Darwish's characterization (see NYSCEF Doc No. 971 at 19).

Footnote 15: To the extent that Darwish's claim for affirmative relief is predicated on his oppression/reasonable expectations argument, the Court rejects the argument for substantially the reasons articulated in Part II (A) (4), supra.

Footnote 16: While not disputing "that some of the Dealerships have been losing money since Darwish was removed from operational control," plaintiffs and TPDs assert that the Dealerships "were losing money before Darwish was removed from operational control as well" (NYSCEF Doc No. 970, ¶ 3, citing NYSCEF Doc Nos. 879-880).

Footnote 17: Additionally, given the Lenders' substantial financial investment in the venture and Darwish's claimed lack of resources, it remains unclear why the Lenders would intentionally cause the Dealerships to lose money. Indeed, the whole notion of forcing a sale seems questionable, given the power of the Governing Bodies to sell the Dealerships over Darwish's objection (see Part II [A] [5], supra).

Footnote 18: Darwish also cross-moved to defer the deadline for the posting of the Undertaking (see NYSCEF Doc No. 1023).

Footnote 19: The parties' remaining arguments and contentions, to the extent not expressly discussed, have been considered and found to be either lacking in merit and/or unnecessary to entertain given the disposition reached herein.

Footnote 20:The Court takes judicial notice of the prior papers and proceedings herein.